Mr. Harrison, I spotted you in the audience yesterday, so you did your reconnaissance of the panel on yesterday to get the lay of the land? Shane Geers That's correct, yes, Your Honor. Mr. Harrison Other on that, there are lots of lawyers who do that, too. You were over there yesterday. Shane Geers We were over there yesterday. Mr. Harrison Ah. We can see from up here, so. Anyway. Shane Geers We're sitting over on this side today with our client, Ms. Blanchard-Daigle. Mr. Harrison All right. Just wanted to let you know we can see you. All right. You're here from Tulane Law School, and you have the opening argument, and Mr. Levine has the rebuttal. Is that right? Shane Geers That's correct, Your Honor. Mr. Harrison Okay. All right. Sir, you're on. Shane Geers Thank you, Your Honor. As you stated, Ben Levine and I are student attorneys with the Tulane Law, Civil Rights, and Federal Practice Clinic, and we've reserved five minutes for rebuttal for Mr. Levine. The complaint in this case, Your Honors, plausibly states claims for relief. Lyle Blanchard, a disabled 59-year-old Navy veteran, was shot and killed in his driveway by Officer Geers of the Bell County Sheriff's Department on the afternoon of August- Mr. Levine Counsel, what does the record show as to why, I believe, after four forms of complaint in the first action, that action was dismissed and then this action was filed? I think it was on the third amended complaint in that first action. I could be wrong. But does the record reflect any reason for that? Lyle Blanchard Any reason for what specifically? Mr. Harrison For dismissing the first case and then refiling this. So if I'm correct, if there had been four variations of the complaint in the first action, now in this second action, we're on the fifth form of complaint, so to speak. Is there anything in the record as to why the first action was dropped and then this second action was filed? Lyle Blanchard Two points there, Your Honor. This is a new lawsuit that was filed. Mr. Harrison I know that, Counsel. I just said that. I said there was a first action that was dismissed and then a new action was filed. Now is there anything in the record as to why? Lyle Blanchard My understanding, not having been trial counsel, but my understanding is that it was dismissed based on- Mr. Harrison No, I don't want understanding. I want to know what's in the record. Is there anything? Lyle Blanchard That there was a, that the dismissal was based on a, that the magistrate judge was going to recommend a dismissal of that complaint, that version of the complaint. The new complaint and the new lawsuit that was filed included the report by Officer Clark of the L.A. Police Department, which added new elements to the complaint. Mr. Harrison Right, which was attached to the new complaint. Lyle Blanchard Yes, Your Honor. Mr. Harrison Of course, that could have been done with, I suppose, the fifth version of the complaint in the first action, but that's all that's in the record that it was dismissed because the magistrate judge was going to recommend dismissal? Lyle Blanchard Yes, Your Honor. Mr. Harrison All right. Lyle Blanchard This Court has never affirmed a Rule 12 dismissal of a deadly police shooting. Mr. Harrison Well, you know, that's what makes this case unusual. Lyle Blanchard Yes, Your Honor. Mr. Harrison That we don't just have the complaint per se. We have attached to the complaint this report by this Mr. Clark or Officer Clark, which incorporates statements, as I understand it, that Mr. Greer's made following the shooting. And of course, an attachment to the complaint is considered part of the complaint and is considered at a Rule 12b-6 hearing. That's what makes this so unusual. I agree. Normally, summary judgment is the stage where we decide qualified immunity. But this is unusual in the sense that not only do you look at the four corners of the complaint, you look at the attachment to the complaint. Lyle Blanchard I agree, Your Honor, that this is an unusual case, which is borne out by the fact that neither appellant nor appellee could cite to a Rule 12 dismissal of a deadly police shooting. And that's because the Court has repeatedly held that a Rule 12 dismissal, which is still the procedural posture of this case, is viewed to disfavor and is rarely granted. Do you know how many are in the cases you surveyed? Did you find any where there was an attachment similar to what was attached in this case to the complaint? Lyle Blanchard The brief does state, as you mentioned, Judge Barksdale, that complaints may include attachments. I'm not sure that we surveyed a case specifically Justice Breyer Where there was an attachment. You didn't find a case where there was an attachment? Lyle Blanchard Not specifically like the attachment in this case. Justice Breyer Right. Lyle Blanchard Additionally Justice Breyer Now, along that line, there's the video. Was that a cam, a video taken in the officer's car of the incident? Lyle Blanchard Yes, Your Honor. There is a dash cam video that was made publicly available. It is not the complete video. It does have cuts. Justice Breyer Right. And the dash cam, the district court refused to consider that. Lyle Blanchard Yes. And that is not included in the complaint, Your Honor. Justice Breyer Right. And the court refused to take judicial notice of it. Lyle Blanchard Yes, Your Honor. Justice Breyer Now, what was the basis reason given by the court for refusing to take judicial notice of the dash cam recording? Lyle Blanchard That it was not included within the complaint, and I believe that the district court could not find case law within the circuit that supported judicial notice of a video, which is borne out by the cases that are cited by the appellee for its inclusion that are either out of circuit or inapt in this case. So, again, that would be an unprecedented move. But the complaint in this case does plausibly allege that Lyle Blanchard's killing was objectively unreasonable because he was unarmed, shot without warning, fell to the ground, clearly incapacitated, and was fired. Justice Breyer There's a number of cases on our court that say when someone's reaching into a pocket or something similar that that gives police justification to think that the person might be pulling a gun out and about to shoot them. What's your best case in a situation where someone's reaching into a pocket or something similar that says you can still get past qualified immunity? Lyle Blanchard There are a number of cases, Your Honor, noting in particular, I should note first that these are, of course, all summary judgment cases, which differentiates all of them. Baker v. Putnell involved a turning motion by an individual in the court held that qualified immunity did not apply based solely on the turning motion of a suspect who had been identified as potentially a deadly shooter on a publicly crowded beach, arguably a more fraught situation than the one presented to Officer Gears. Further, the cases that you're referring to, Judge Costa, are not on point here. First, because they were at the summary judgment stage. Lyle Blanchard I'm not sure. It's an interesting point you make about Rule 12 dismissals being rare in this context. But if we take all the allegations in your favor, which we're required to do at Rule 12, if the law says there's qualified immunity, then that's the proper ruling. I'm not sure at the end of the day why the posture matters as long as we're taking all the allegations in your favor. I think the plausibility standard is a critical difference, as well as what a judge is required to do at the summary judgment stage. Those two factors would differentiate the cases between a Rule 12 dismissal and summary judgment. Given the Rule 12 liberal pleading standard... I mean, there are a lot of other qualified immunity dismissals at Rule 12 that we've upheld. There have been, yes, Your Honor. I think what's critical about the cases that you were addressing, chiefly, and cited by the district court, Manos, Ontiveros, and Reese, was that two factors about those cases. Critically, that in all of those cases, there was noncompliance by the individual. In Manos, for instance, when officers were standing within arm's reach of the individual, he was repeatedly told to show his hands instead of reaching under the seat. And in that case, he was seen retrieving an object. And the complaint in this case notes that Mr. Blanchard never retrieved the object. He was reaching for his identification, and that was never retrieved from his pocket. And the complaint notes that he was compliant at all times with the orders of Officer Gears. Now, you say he was reaching for his identification. Obviously, the officer wouldn't know that. He wouldn't know what was in the man's pocket. No, Your Honor, but that is stated in the complaint, so that is why I referenced that. Well, but that's just pure conjecture. You don't know why he was reaching in his pocket. Maybe he had an identification. That's true, that the officer would not know that. But the escalation to using deadly force based on that reach is not borne out by the case law, because, as I mentioned to Judge Costa, that Manos and Ontiveros both involved noncompliance by the individual. I don't know if this is quite noncompliance, but it is he unprompted gets out of the vehicle, is my understanding of the allegations, which is unusual. I mean, usually you wait for the police. I mean, that could also induce fear in the officer that this person on his own is getting out of the vehicle and then he reaches for something. So the complaint in Section 4, which is the chief body of what occurred in the shooting, notes that at the time that the vehicles had stopped that Mr. Blanchard waited in his vehicle for instruction and that he heard none. So given that we're at the 12B6 stage, it is a reasonable inference that he did not know why he had been pulled over and opened his door, still waited, heard no instructions, and exited the vehicle to determine, again, why he had been pulled over and why Officer Gears had issued no warning or issued no information as to why and had not even approached the vehicle. Again, because this is at the Rule 12 stage. Let me ask one more question about the excessive force. Does your allegation depend on the initial shooting being excessive, or is there a separate theory that the shots, once he was already on the ground, are excessive? Both would apply, Your Honor. That it was objectively unreasonable and clearly established by case law that the initial shot, because there was no audible warning given and that Mr. Blanchard had made no threat, as in the mannis ontiveros, and had showed compliance, that the initial four shots were objectively unreasonable and that a clearly incapacitated and downed individual, Mr. Blanchard, that it was objectively unreasonable to fire at such a man, as Officer Gears chose to do. That's borne out in the case law by Graves v. Zachary, where the Court stated not only was it clearly established, but that no case was needed for an officer to know that they should not fire, in violation of suspects' Fourth Amendment right to be free from excessive force, on a downed or incapacitated individual. And the complaint states that once he had fallen to the ground, after being shot at four times, he was clearly incapacitated and thus was fired. So in either instance, Your Honor, the first volley, four shots, or the second volley. And cases such as Baker, as well as the municipal liability cases, also were concerned with the number of shots that were used. Obviously, when an officer chooses to fire his weapon, that is the gravest determination that is made in a spectrum of possible options that the officer could take. And yet, in this case, the officer didn't choose to fire one shot to subdue the individual. Rather, he fired four shots. And even after, as the complaint notes, Mr. Blanchard was clearly incapacitated on the ground, he chose to fire four more times. The Court in Baker was concerned by six to seven shots that were fired at an individual, as well as in Diamond Brooks. And it's... Kennedy, I'm going to ask you a couple of questions. Yes, sir. One, from your standpoint, are you better off with your plausibility burden, where we have to construe the facts in a light most favorable to you, than necessarily summary judgment, where we construe the facts against a non-movement? So does that make a difference? Maybe you've already answered that, but why, because we're in 12-6. Which facts in your complaint, the complaint at issue, benefits you more with us having to construe it in your favor? That's true. In terms of getting over staying in court. To meet the Rule 12 standard? Yeah. I think that, given at the Rule 12 stage, that a number of the facts in the complaint would point to, would lead to reasonable inferences of liability. That the reaching motion into a small cargo short's pocket, that it could be a reasonable inference at a traffic stop. Let me ask it a different way. As I understood, both from reading it before and in the first set of questions Judge Barstow asked you, in the prior complaints, which were dismissed, the major difference between that and the live complaint is the addition of the report. Is that right? That's right, Your Honor. So were any of the other allegations that would typically demonstrate plausibility, all of those are the same in 1, 2, 3, 4. It's the addition of the report. Is that, in other words, assuming that in answer, I think you said, well, Judge Barstow asked, well, why was it dismissed? And I think your answer was, I guess, in the face of perhaps an imminent dismissal by the magistrate judge, counsel opted to dismiss and refile, right? Yes, Your Honor. So in the refiling, there were no other iterations different in the complaint. It's just the addition of that supplemental, right? That is my best understanding, yes, Your Honor. All right. You've already been asked about other cases on this. So just help us, I mean, as succinctly as you can. Assuming on what you've played before, that one was going down, what's the core in the addendum that gives you the extra power to stay in court? Do you follow my question? Yes, Your Honor. First, as I noted to Judge Barstow, that this is a new lawsuit. Second, that the complaint and Officer Clark's report does add additional facts that show that Officer Geer's actions were not in compliant with national standards for policing. It notes that the training regimen showed deficiencies that's alleged in the report itself. So those are some of the facts that were added. And for context, it does add, as Judge Barksdale points out, the interview with Officer Geer, which was given after the fact and should be viewed in the Rule 12 context. And, you know, that's what is extremely interesting because in the comment statement by the officer, which is included in Kraft's report, the officer doesn't say he was reaching into a pocket of his cargo shorts. He says he reached behind his lower back with his left arm and under the tail of his shirt in a way that placed me in fear that he had a gun and was going to shoot me with it. I yelled as loud as I could to show me his hands, and I saw his arm coming forward from his lower back waist as if he were bringing a gun out and up. Although I did not clearly see his hand, I felt like he had to have a gun in it by the motion he made, and it appeared to me that he was pulling a gun on me. Now, that's quite different from he was reaching into his cargo shorts' pants. It is different, Your Honor. And given that this was a – Pocket, not pants. Cargo shorts, pocket. And given that this is a Rule 12 case and those facts were stated by the officer after the fact, it is a reasonable inference that those are post hoc rationalizations. Well, that's your observation. But you're the one, counsel, attached this statement to the complaint for reasons unknown. I don't know whether it was you or whoever, but whoever counsel was that filed this complaint had attached it. So, you know, you live by the sword and you die by the sword. I see I'm out of time, Your Honor. Well, no, you can answer my question. Why the report was attached? No. The vast difference between what his statement is in the report and what we're being told about he reached into the pocket of his cargo shorts. So this does give additional basis for granting the qualified immunity. Well, again, Your Honor, at the Rule 12 stage, this complaint need only allege plausible claims for relief. And looking at the body of the complaint, as well as the interview, given that that interview is after the fact, and all inferences are given in the light most favorable to the plaintiff, that those statements would be best viewed as a post hoc rationalization that occurred after the fact. And for those reasons, this complaint has plausibly stated claims of relief to overcome qualified immunity and municipal liability. Thank you, Your Honors, and it was an honor to present today. Thank you for allowing me. Thank you, Mr. Harrison. You've handled yourself very well. All right. We'll see Mr. Levine back up on rebuttal. All right. First up, Mr. Rivera. Good morning, Your Honors. I'm Joe Rivera, and I represent Bell County, Texas, and Deputy Shane Gears. I think I'm allotted 13 minutes of the police time, and counsel for Hatfield has seven, so I'm glad to jump to any particular issue in my 13 minutes that the court wants me to. Otherwise, I'd like to address a few things that were— Well, let's start with where we finished about the fact that, you know, the plaintiff makes his or her own case. That's their—they control their own case. For reasons—it doesn't matter the reasons—the plaintiff attached this craft report by this, I suppose, former officer and included—which included the statements made by Officer Gears as to why he—his position on why he did what he did, which is vastly different from what the complaint says took place. And we're told, well, this is just not plausible. This is a post hoc rationalization. So on what basis could the district court say, well, I'm going to go with what the officer said and not what the allegations of the complaint are because they're both before me? Well, as you pointed out, Your Honor, under Rule 10c, once that document is attached to the pleading, it's part of the pleading. And I think that just because we're here on Rule 12b-6 review or the district court was reviewing a Rule 12b-6 motion does not mean that it's part of the plausibility standard. He can't review the document for internal inconsistencies and see that the much more detailed statement by Deputy Gears simply controversed the selectively chosen and sometimes outright incorrect allegations of the plaintiff. And they say it's a post hoc statement. All statements are post hoc. That's the nature of a statement. Deposition testimony, in-court testimony would all be post hoc. And I think the tie, so to speak, goes to Bell County and Deputy Gears in that the reason that this statement by Deputy Gears was offered up, and keep in mind it is a statement he made to the Texas Rangers as part of their investigation, but the reason it's offered up as part of Roger Clark's report is it's the basis of Mr. Clark's report. Why on earth would your expert take a statement and opine upon it if it was not a reliable, factually accurate statement? I mean, that's the nature of Rule 701, 0203 in terms of expert reporting. Now, I'll point out to the court that we objected to Mr. Clark's report, and the district court sustained that objection in that it refused to consider his opinions because they're just conclusory. He uses buzzwords. Deputy Gears was unreasonable. The training was deficient. There was deliberate indifference here. With no analysis, no factual basis to support those things, and we cited to the court a number of cases where this court said conclusions on the reasonableness of the use of force are legal conclusions that we don't need experts opining on. That's for the jury. But to the extent that he incorporated Deputy Gears' statement and, in fact, discusses his review of the video, those are the facts of this case. And part of what this court has consistently stated in its Rule 12b-6 jurisprudence is there's an aspect of reviewing cases for futility. Should this case proceed or would allowing it to go past the pleading stage be futile? The video and Deputy Gears' statements are the facts. They're the facts today. They'll be the facts tomorrow. They'll be the facts if you send this case back to the district court. But given that, I mean, as you say, you know as well as we do, most of the time we're dealing with, I say most, frequently we're dealing with the qualified immune defense at the summary judgment stage. I mean, I don't know what the percentage is, but we can just take judicial notice. It's a lot of them that are there. So that said, every now and then, one last month the district court denied it and they actually had a bench trial, and it wasn't until then. But in the heartland are summary judgment ones. So that said, with this report and all of that and plausibility and NICPO and there not being another case, I mean, the qualified immunity defense will be the same at summary judgment. It's just something distinctly unusual, especially the report and so forth. So, I mean, what carves it out is, you know, 12P7. We're talking plausibility, not necessarily whether they can prove it, whether they can sustain it. You know, we've got, as I recall, this was a daytime shooting, wasn't it? This was during the day. Yeah, I mean, many of the ones we get, you know, they're nighttime, there's dim light, you know, you can't see their shadows and so forth. As I recall, this one was midday and I don't remember what the distance was, but there are features to it that are just seemingly somewhat different. So if Your Honor's concern is that we're at the 12B6 stage and therefore the only hurdle is plausibility, it is nevertheless a hurdle. You still have to plead facts to show you have a plausible claim for relief. As to Bell County, that means pleading facts to show that a policymaker was involved in promulgating an official policy that was the moving force behind this violation. And as we've briefed, there was no factual allegations on any of those elements. And I can go through any of those elements that are of particular concern to the court. And then on the use of force as to Deputy Gears, again, no pleading that demonstrates his force was clearly excessive or objectively unreasonable under the circumstances. Well, he shot him four times, didn't he? Initially, what, three or four, right? I mean, his initial volley, wasn't it three or four shots? It's broad daylight. He's, I don't know, how far behind. I guess the sirens and all that stuff. I mean, if you take the statement, it says, well, he, you know, told him to stop. I'm not getting into whether all that happened. But I guess I just keep coming back. It's broad daylight. And he gets out and he sees the guy, admittedly unprompted. He gets out. I mean, people stay in. But he gets out and it says he starts to reach. And as Justice Costa mentioned, we've got plenty of cases where, you know, we've said, you know, if somebody's reaching, then that's reasonable. But then the officer not only shoots once, but he unloads. He shoots him four times until he goes down. And there are the other shots. So my question kind of in that, you know, the four shots, unreasonable under the circumstances. I mean, it's just a little. Let me answer. I'm not pushing back. I'm just saying it's just a troublesome case for a lot of reasons. I understand. And, you know, part of the argument, I mean, you even heard this as part of the opening comments. This was a disabled man. He was a Navy veteran. I'm not here, of course, as counsel for Bell County, to say it's not a difficult case. And the officer doesn't know any of that. But the officer doesn't know any of that. And to kind of answer your question by piggybacking on one of the comments by Judge Acosta, what is our best case? It's the Salazar-Limon case that this court decided in 2016. Now, I'll say that that was a summary judgment case. But what this court said in Salazar-Limon is, where a DPS trooper pulled someone over on suspicion of DUI, and therefore that person was potentially intoxicated with all of the implications that go along with that, poor judgment, that sort of thing, and then showed signs of wanting to flee and resist, and then ultimately took a couple steps away from the DPS trooper, turned back towards the trooper, and reached under his shirt towards his waist. This court said that was not just a qualified immunity case. The use of force there was not unreasonable. It was not a violation of the Fourth Amendment. And I'll point out, Judge Stewart has said, well, some of these other cases have these distinctions. It's dark. It's this or that. What this court said in Salazar-Limon is, on the summary judgment context, even though there might be factual disputes about some of these other details that would set the stage, so to speak, about the level of danger that the officer perceived, the bottom line was this. This court said the factual dispute that mattered was whether the person made a move towards their waist in a drawing-type motion, and unless the plaintiff there could present controverting evidence that that move, that gesture was not made, that settled the case. And this court said there is no controverting evidence on that point, and so summary judgment was appropriate. So again, we may be at the pleading stage, but they will never be able to plead. that this encounter did not culminate in the same gesture as Salazar-Limon did. But what about their, it seems to me they allege first that there's a couple shots, then it says while he's on the ground, obviously injured and bleeding, there's additional shots. And again, at the pleading stage, I don't know whether there's really that separation in time in what the record, what the video would actually show, but as pled, they say he's on the ground and there's additional shots fired. How do you get around that aspect? So number one, the cases that are mentioned about multiple shots are cases that involve other egregious facts. So for example, the beachgoer case that was mentioned in the opening comments, that was a case in which there was no question the officer did not warn the person to the officer's presence, the person was not otherwise aware of the officer's presence, all sorts of things that would say maybe shooting that many times was an overreaction. But here, if we are going to assume, and we must under Graham, that from the officer's perspective he perceived that the person was drawing a weapon, the number of shots to address that fear, the number of shots to- I don't think it's so much the number of shots, but the allegation is that after he was down and already hit, there was a continuation. And again, this is one of the things facts will flesh out, whether it was just four rapid-fire shots or whether there was this separation in time. But as I read the complaint, it suggests that there is a separation, at least a few seconds where the officer would realize he's down and yet he keeps firing. Well, I think there's a distinction to be made of whether the officer realizes he's down and whether the threat is gone, because a person who is down can still fire their weapon. And that's what the officer is doing, and that's what this court's case law says. The officer can address the threat and use enough force to do so. So whether he's laying on the ground, whether he's sitting in the car, however he's positioned, the officer can fire enough shots to know that deadly force has been used because it's justified under the circumstances. In fact, that's what the officer says in his statement is why he continued shooting. Now, I've been comparing the factual allegations in the complaint at pages 4 and 5 with the officer's statement. For example, the complaint says the officer gave no instructions to the decedent. Well, the officer says he did. The complaint says the decedent made no moves toward the officer. The officer says he did. Interestingly, the complaint says nothing about the comment that the officer says the decedent made to him when the officer got up to the car and the decedent said, what the F do you want? So how does a judge handle these inconsistencies between the allegations in a complaint and the document that the plaintiff chose to attach to the complaint as far as plausibility or the other standard for Rule 12b-6 dismissal? I think the way that a judge can handle this, the way the district judge handled it in this case is the ruling was based on the face of the plea. I don't think the district judge really indulged a lot of the factual content of Officer Clark's report. But I'll say this, and I might spill over just a second. Well, this is de novo review, so how the judge handled it is immaterial. I'm talking about this panel. Yeah, absolutely right, Your Honor. So what I would say to this panel is this. Number one, this panel could look at the face of the pleadings itself and the face of the pleading. And by the pleading, I mean the complaint itself, aside from any attachments. And for the reasons we have set out in our briefing, those are insufficient to state a claim. You'll notice in our briefing that we separately address the complaint itself and then the additional facts set out in Mr. Clark's report. But ultimately, I see my time is up. You keep going. You're here, all of you, to answer our questions. So I'll stop you when it's time for you to go. But, Your Honor, if you look at the body of the complaint itself, you will see that their own allegations line up with cases like Salazar-Limon and like some of the cases that Judge Stewart has mentioned where there are other facts or circumstances. So this court has held in cases like Bauzon, we don't just look at the moment of the encounter. We look at the things leading up to the encounter that set the stage. By their own pleadings, this encounter began as a traffic stop on a public paved road. Rather than pull over on that paved road, Mr. Blanchard turned onto a dirt road. Still didn't stop. He then proceeds down that dirt road for 1,000 feet by their own allegations, almost a quarter of a mile, for no apparent reason. And then and only then does he abruptly stop, exit his vehicle without being instructed to do so, turn towards the officer, towards the deputy, and make a motion towards his waist. That's Salazar-Limon. I mean, I know we can talk about dark versus light and things like that. Those are the threatening circumstances. Do I understand you to be saying that the district courts construed the last complaint, which counsel says is different than the other, and did not take into account the addendum report? That's not here to be the case. But this court, because this is de novo, is free to do so. So point number one, pleadings of the complaint itself are sufficient to dismiss. Point number two would be, as Your Honor pointed out, it's 10C material. All right. Then my question is, what about the video? Should we be looking at the video as well? We're on de novo on the videos there. The court didn't look at it. If they didn't look at 24, should we look at the video and add that into our equation? Or because the district court didn't look at the video or consider it, should we only look at the complaint? Just asking. I mean, I know it's de novo review, but that's why we said it. Point number one in response to that question, Your Honor, I'd be remiss if I didn't say I have made an argument in my briefing that this should not be de novo review for many of the reasons that Judge Barksdale pointed out during his questioning on the opening. We're now on our fifth iteration of this case. We're three years in. That's a loser, so answer his question. Okay. But as far as de novo review, yes, Your Honor, I think this court should take judicial notice and review the video because that is the scenario. And admittedly, I agree with the comments of counsel for appellant. So what if the video contradicts some of what the officer says? I mean, it's hard at the Rule 12. That's the difficulty. How do you resolve these conflicts? I mean, it has to be resolved in favor of the plaintiff. And that's the point I was making, Your Honor. It will conflict with Deputy Geer's statement. And for no other reason than it was used for news coverage, and therefore it was edited down. And so some of the commands are going to be edited out. Some of the encounter is going to be edited out. But my point would be— It's not the entire encounter. That's exactly right. But my point would be this. If this court wants to have a visual of how this encounter culminated, because we're told he's reaching into a cargo pit to get his wallet, the video is accurate as to that. And we've cited cases to say if it's in the public forum, this court can take judicial notice. It's also cited in the report that's attached to the complaint. The video is cited in that. Absolutely. Officer Clark recites some of his factual observations for the video. I think the value of the video, and this court taking notice of it, is you can see this is not a man who kind of fumbles. It is a spin, turn. I mean it's—and I don't mean to make light of it, but it's almost a western-type move. And under all those circumstances, that's why Deputy Geer is feared for his life. Well, the chief judge is being very generous with time. So if I could just—I want to ask you this, because I'm getting a little confused now. Did you seek to introduce the video at the 12b-6 hearing? Yes. Yes, that's what I thought. And is it part of the record? Was it marked for identification when the judge refused to consider it? No, we did not go through that process. Right, so it's not even in the record. Well, what we did, Your Honor, was we provided a hyperlink to the news coverage because my concern was I wanted to demonstrate that it was in the public record and therefore make it available. But it was not marked for identification? No, it was not. Interesting, interesting. All right. I mean, you know, I'm allowing time, but, I mean, obviously it's, you know, the case is what it is, and that's why you all are here to help us. We've read the briefing and the record and all of that, but the questions are designed to help us illuminate, you know, what we have. So . . . I hope I've done that. No. Counsel, any additional questions from the panel? Okay, but the video, I just did have a question because I didn't see, you know, an objection when I thought I saw something from the point of saying, you know, take judicial notice, and I kept waiting to see, well, was there an objection, and then it wasn't, and then it's just not clear what the view on it and all that. Okay. All right. Thank you. All right. Mr. Smith. It's actually Mr. Dennis, the . . . Okay. I'm sorry. No problem. I think the clerk had just written down my name wrong for whatever reason, so when I checked in this morning, she kind of made me nervous when I said my name. So what's your name? I didn't know. What's your name, for the record? What's your name? Seth Dennis. Oh, Dennis. Okay. Yes. Got it. Thank you. All right. Mr. Hayes. Ranger Hatfield is entitled to qualified immunity as there is no clearly established law that a peace officer violates the Constitution when he fails to include in an affidavit in support of a search warrant that the person's house to be searched is, in fact, dead or that they were shot by a peace officer when they didn't have a weapon on them. And as there's no clearly established law . . . Correct. I mean, the stop initially was drunk driving, DUI, whatever, whatever, whatever, not selling cocaine or trafficking or whatever, whatever. So was that the norm? I mean, he knew the gentleman was dead, right? Yes. Was the fact of his decease set forth in the application for the warrant? It's not in the record, but it said he was subdued. All right. Press ahead. I just . . . Well, don't we have some authority by our court, Whitehurst v. Wright, 592F2nd834 at 845th Circuit, 1979, to say that a deceit, a person who is deceased does not carry over a Fourth Amendment right? Correct. And that was what the basis of the district court is in dismissing the case. And I would agree with that also. We didn't brief that, I'll be honest. We relied . . . we were responding . . . Well, that's the question. Why didn't you brief that case? I was responding to the plaintiff's brief. I honestly probably should have included that, but I was just responding to their brief. But I believe they can serve it. Since it's de novo review, I believe that the court can use either basis to affirm the dismissal of the plaintiff's complaint. So that would be the reason. Judge Barksley, I wanted to give you some context, because initially you asked about kind of the procedural posture of how this case all played out over the two cases. And I wanted to give you some context there, because I was involved in both. The — I believe if you look at — if you look at the motion to dismiss that I filed in this case, in the statement of the case, I laid out briefly a procedural posture of how this case — how the first case played out, and then we came to this second case. And the reason I did that is because I wanted to be able to tell the district court this was the same complaint against my client. Nothing had ever changed. And in the first case, they filed multiple complaints. I filed motions to dismiss. They'd amend their complaint. Nothing would change. I just arranged a hat field. Then Judge Magistrate Manske issued, I believe, a quite extensive, 12- or 13-page report and recommendation to dismiss the case. And rather than objecting to the R&R, the plaintiff simply non-suited their case, and then turned around and filed — this was the district court counsel, and this is not counsel current — filed the exact same complaint. I don't know that there was a word change in it, especially with regards to my client. I know they added on the affidavit report from the police officer. But that changes, again, nothing with regards to my client, and filed the exact same thing. And — This is in Waco? Yes. It's a single district judge, right? Because, I mean, it does seem like maybe they're trying to get a different judge. But with a single district judge, that's not going to happen. Right. And what happened — actually, what happened was on that, that was when the Waco court was still out of vacancy, and Judge Pittman out of Austin was handling those cases. But still, you're going to get one judge, right? Or no? 100 percent of the cases went to that same judge. Yes. Judge Pittman was handling the complete Waco docket in addition to his Austin docket. But he was out of the same magistrate that was being used, because there's only one magistrate in Waco. So you're not getting a different judge by refiling. That's what I'm — You're not getting — no, there's no — you're not picking a — it's not like in Houston where you have — Right. I mean, even in a big — there, there would probably be a related case issue of going back to the same judge. But here, there's not even the chance of going to a different judge. Absolutely. No. And that was — actually, frankly, it was part of the reason that Judge Albright sanctioned the plaintiff's counsel in this case, is that they changed nothing. They simply had this — they just tried to set — they non-suited the case instead of filing objections and then tried to refile it again, and nothing changed. So I thought if you go into that on my motion to dismiss, I briefly go through a little procedural posture on there. I believe I give the cost number of the previous case for you to be able to review, to go into if you wish. But that's the context in which this arose. If the court doesn't have anything further, I have nothing further to add to this. If you have no questions for me, we'd simply ask the court to affirm the dismissal of the plaintiff's complaint against Ray Traffield. OK. All right. Thank you, Mr. Dennis. Thank you, sir. Thank you, Arch. All right. Madam Court, could you add two minutes to Mr. Lewine's time? We asked a lot of questions on Mr. Rivera, extended out a little bit. He's got a lot to talk about. So give him two additional minutes. He's got seven instead of five. So you're up. The clock's running. Thank you, Your Honor. May it please the court, Ben Levine for the appellant. I'd like to first address the second volley of shots that were fired at Mr. Blanchard. This court in Baker v. Putnell stated that the number of shots and the nature of wounds raise a serious question as to the reasonableness of the officer's conduct, more of a question of fact than a court may dispose of on summary judgment. And this is a Rule 12 case. In terms of the reaching motion cases, as my co-counsel stated, all of those cases were decided on summary judgment. And Rule 12 does not allow the proper context to understand what type of reaching into a pocket this was. There are a lot of different ways that one can reach into their pocket. Does the video help you? Or I don't mean you personally. I mean, you know, there's a video. It's broad daylight, so presumably there are not obstructions and all that. So with respect to the client getting out of the vehicle, the turning, the reaching, et cetera, does the video help your plausibility hurdle? Yes, Your Honor. I've seen the video, the entire video, not the publicly available video that only has snippets. And the video adds— No, wait. The entire video is not part of the record. Yes, Your Honor. And the— Yes, what? Yes, it is part of the record, or yes, it's not part of the record? Yes, you are correct. It is not part of the record. All right. So how can we consider it? Well, it is our contention that the video cannot be taken under judicial notice at this time. At the Rule 12 motion stage, both the defendants and the defendants asked that the court take judicial notice of the video. The cases that they listed in support of that contention are not on points. One of them was about the court taking judicial notice of a separate judicial opinion. And in the other case out of the district court in Washington, it was about where a court decided not to take judicial notice of a YouTube video and listed as only one of the reasons for not taking judicial notice of the video was that its authenticity could not be established, but not that that was the only reason not to consider the video. We hope that this video will be considered at the proper stage of the proceeding. The video contradicts the statements made by Officer Geer— Now, wait. But you're not seeking to have it considered by this panel? No, Your Honor. Wait a minute. Then I don't understand what you're saying. Well, that— I started off asking you, does the video help you or hurt you? I didn't see an objection to the video, and so that's why I asked a lot of questions. And so I thought I'd ask you, how does the video help you in terms of, you know, the contentions about qualified immunity, in terms of the person getting out, the turn, the reach, et cetera, those things that counsel opposite has mentioned? Yes. So do I understand that you object to the court viewing the video that's in the record? Is that the position you take? What is true is that the video— So either you object or do you not? We object to the video being used as the sole consideration, whether or not his actions were reasonable, but not to provide additional context, such as the fact that the video— You want us to look at it but for the purposes that you want us to look at it? I'm not—Your Honor, I'm not— See, we either look at it—I'm not trying to trick you, but we either look at it or we don't. Yes, Your Honor. And if we look at it, then we look at it for all purposes. I'm just trying to make sure I'm clear. Yes, Your Honor. Whether from that side of the table— Yes, Your Honor. And we are not scared of the court viewing the video. However, it is our contention that Rule 12 is not the proper place in the proceeding for the video to be considered. In the response to the Rule 12 motion, the trial counsel asked that the district court consider the video and convert the proceeding into a summary judgment proceeding. The district court did not do that. The district court, I believe, did not even say anything about the existence of the video in its dismissal order. Well, allow for the possibility that the district court viewed it was dealing with 12b-6, and you rise or fall on your pleadings. So if the district court was looking at the pleadings, you know, on plausibility, it would make sense to not look any further, wouldn't it? Yes, Your Honor. And what we're saying is that in the last—in the live pleading, as I said this before, there's no difference in the allegations from the other versions. The only difference in terms of the live pleading is the addition of the report. Is that correct? There is also additional facts alleged, I believe, Your Honor. In the complaint itself? Yes, Your Honor. Okay. Speaking of—turning to the interview that is included in the report, the interview are not—the complaint does not allege that the interview is stated facts. The complaint alleges that Mr. Gears made the statements, but not that they are true. So considering the complaints, the facts alleged in the complaint as true— So why was it—is there any statement in the complaint as to why it's attached? And is there any basis given for how it should be considered? Yes, Your Honor. The basis for the interview, I believe, was that Mr. Clark was considering the video so as to consider both sides of the incident in order to make any analysis that he provided. And additionally, the interview can be seen as important for the municipal liability issue as it provides the context by which this investigation was taken through. It's reasonable inference that the county used the video and the interview when considering whether or not to reprimand or discipline Officer Gears. They did not discipline or reprimand Officer Gears, and he was back on the force within a matter of weeks. We contend that this is evidence of a policy that the county has ratified. And the case, the Hobart case, is instructive as it— looking at the amount of shots that were fired at, in that case, also an unarmed individual, when considering whether or not a jury could plausibly find that it was an extreme factual scenario, it said that the extraordinary number of shots fired— and in that case, it was six or seven shots fired at an unarmed individual— but the extraordinary number of shots fired could have a jury reasonably consider that it was an extreme factual scenario. Again, the four shots, the last four shots, were fired at Mr. Blanchard when he was on the ground, clearly incapacitated, and this Court has held in Lytle v. Bexar that deadly force— I'm sorry, I see that I'm running out of time, but may I briefly conclude? That deadly force, even if justified in one second, is not justified just seconds later if the serious threat has subsisted. For that reason and other reasons, we respectfully ask that you reverse. Thank you. Thank you. All right, that concludes the oral argument. Thanks to counsel on both sides for the briefing and arguments. Before we take up the third case, the panel will stay.